**The below described is SIGNED.**

**Dated: December 11, 2013**

*William J. Thurman*

**WILLIAM T. THURMAN**
**U.S. Bankruptcy Judge**



## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| In re:<br><br>**CHRISTOPHER BLACK CANNON,**<br><br>Debtor. | **Bankruptcy No. 13-24366**<br><br>**Chapter 13**<br><br>**Chief Judge William T. Thurman** |

### MEMORANDUM DECISION

PNC Bank, N.A. ("PNC") and the Chapter 13 Trustee each filed a Motion to Dismiss the Chapter 13 case of Christopher Cannon (the "Debtor"), alleging that his secured debts exceeded the limit imposed by 11 U.S.C. § 109(e).[1] The Court conducted an evidentiary hearing on the motions on October 21, 2013. Douglas Short appeared on behalf of the Debtor, Matthew Moncur and Steven Burt appeared on behalf of PNC, and Ryan Cadwallader appeared on behalf of Kevin R. Anderson, the Chapter 13 Trustee.

The Court took the matter under submission and issued its ruling from the bench on October 24, 2013, where the Court made its findings of fact and conclusions of law on the record. The Court

---

[1] All subsequent statutory references are to title 11 of the United States Code unless otherwise indicated.

entered its Order on the Motions to Dismiss of PNC Bank, N.A. and the Chapter 13 Trustee on

November 7, 2013, which dismissed the Debtor's Chapter 13 case. The Order also provided that the

Court would enter a written Memorandum Decision memorializing its findings and conclusions

made at the October 24, 2013 hearing. The Court now issues the following Memorandum Decision,

which constitutes the Court's findings of fact and conclusions of law under Federal Rule of Civil

Procedure 52, made applicable to this matter by Federal Rules of Bankruptcy Procedure 9014 and

7052, in accordance with that Order.

## I.    JURISDICTION AND VENUE

The Court has jurisdiction over this matter under 28 U.S.C. §§ 1334 and 157. This contested

matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (B). Venue is appropriate under 28

U.S.C. §§ 1408 and 1409, and notice of the hearing on the motions to dismiss was properly given

in all respects.

## II.    BACKGROUND AND FINDINGS OF FACT

In this matter, PNC and the Trustee moved to dismiss the Debtor's case because they alleged

that his secured debts exceeded the limit imposed by § 109(e). The Debtor filed the present Chapter

13 case on April 22, 2013 and filed his Statement of Financial Affairs and Schedules on May 30,

2013. His Schedule A lists a "half ownership" interest in real property located at 875 East 1600

North, Mapleton, UT. The Debtor values the property at $1,617,200 and lists the amount of secured

claims against the property at $1,676,986.81.[2]

His Schedule D lists three secured claims, all held by "PNC Mortgage as Servicer for

_____

[2] Docket No. 13, Debtor's Schedule A.

2

Unknown Creditor.["3] The first secured claim represents the first mortgage against the Debtor's Mapleton property. The Debtor lists it for $1,385,155.56, and lists it as disputed and unliquidated, but he does not list it as contingent.[4] At the hearing on PNC's and the Trustee's motions, the Court received Exhibit 1, which is the promissory note the Debtor signed with National City Mortgage, showing an original balance of $1,495,000.

The second secured claim represents the second mortgage against the Debtor's Mapleton property. The Debtor lists it for $291,831.25, with an unsecured portion of $59,786. The Debtor lists this claim as disputed and unliquidated, but he does not list it as contingent.[5]

The third secured claim represents a mortgage against a condominium located at 171 E 3rd Ave. #714, Salt Lake City, which property is owned by 714 Terrace Falls Condo, LLC.[6] The Debtor's Schedule B lists a 17% interest in 714 Terrace Falls Condo, LLC.[7] The Debtor does not list the third claim as disputed, unliquidated, or contingent.[8]

On May 3, 2013, the Clerk of Court sent out notice of the Debtor's Meeting of Creditors, which was scheduled for May 31, 2013.[9] The notice also scheduled the confirmation hearing in the

---

[3] Docket No. 13, Debtor's Schedule D.

[4] *Id.*

[5] *Id.*

[6] *Id.*

[7] Docket No. 13, Debtor's Schedule B.

[8] Docket No. 13, Debtor's Schedule D.

[9] Docket No. 4, Notice of Chapter 13 Bankruptcy Case, Meeting of Creditors, & Deadlines.

Debtor's case for July 9, 2013.[10] The Court conducted a hearing on confirmation on that date, at which hearing the Trustee and the Debtor, through counsel, both appeared. The Trustee informed the Court that the Debtor may not meet the debt limits for a Chapter 13 debtor under § 109(e). At that time, the Debtor's mortgage creditors had not yet filed proofs of claim. In response, the Debtor informed the Court that he intended to file a lawsuit challenging the amount of the mortgage claims.

The Court set the debt limit issue for evidentiary hearing on October 21, 2013 and ordered a shortened discovery and briefing schedule, which provided that the Debtor and the Trustee would have until October 1, 2013 to file simultaneous briefs. While the Court's order did not require PNC to file a motion to dismiss by that time, on July 19, 2013 PNC filed its Motion to Dismiss under § 109(e).[11]

The Debtor interpreted the Court's order on discovery to apply not only to the Trustee, but also to PNC. The Debtor served interrogatories, requests for production, and requests for admission on PNC, expecting a response within 15 days. In response, PNC moved for a protective order, arguing that because it was not present at the July 9 confirmation hearing, the Court's order on discovery did not apply to it.[12] The Court heard PNC's Motion for Protective Order on August 7, 2013. The Court granted the motion in part and denied it in part, ruling that PNC did not have to respond to the Debtor's discovery requests on shortened notice. The Court also set PNC's Motion to Dismiss for October 21, 2013, to be consolidated with the hearing regarding the Debtor's

---

[10] *Id.*

[11] Docket No. 31, PNC's Motion to Dismiss.

[12] Docket No. 46, Motion of PNC Bank, National Association, for Relief from Order Pursuant to Bankruptcy Rule 9024, or in the Alternative, Motion for Protective Order.

qualifications under § 109(e).[13]

On August 26, 2013, the Court conducted a hearing on PNC's Motion for Relief from Stay. At that hearing, the Court authorized discovery between the Debtor and PNC.

On August 29, 2013, the Trustee filed his Motion to Dismiss under § 109(e), which was followed by a supporting memorandum on October 1, 2013.[14] The Debtor filed his consolidated opposition to PNC's and the Trustee's Motions to Dismiss on October 4, 2013,[15] and PNC filed a reply brief on October 15, 2013.[16]

## III.    DISCUSSION

*A. Debtor's Objection as to Timeliness Under Local Rule 2083-1(h)*

As a threshold matter, the Debtor asserts that the Trustee's and PNC's Motions to Dismiss should be denied under Local Rule 2083-1(h) because they are untimely. That rule provides: "A party must file and serve a motion to dismiss a chapter 13 case under § 109(e) of the Code not later than 7 days before the date set on Official Form 9I for the plan confirmation hearing. Such motion will be heard at the plan confirmation hearing, unless the court orders otherwise."[17]

The Clerk of Court filed Official Form 9I on May 3, 2013, which provided that the confirmation hearing would be held on July 9, 2013. Therefore, the deadline for motions to dismiss

---

[13] Docket No. 62, Order Pursuant to Hearing on Motion of PNC Bank, National Association, for Relief from Order Pursuant to Bankruptcy Rule 9024, or in the Alternative, Motion for Protective Order.

[14] Docket Nos. 69 and 95.

[15] Docket No. 99.

[16] Docket No. 102.

[17] BANKR. D. UT. LBR 2083-1(h).

under § 109(e) was July 2, 2013. PNC filed its Motion to Dismiss on July 19, 2013 and the Trustee

filed his Motion to Dismiss on August 29, 2013.

Ordinarily, the Trustee's and PNC's motions would have been untimely, but other facts in

this case persuade the Court to conclude otherwise. The date initially set for the Meeting of Creditors

was May 31, 2013. On that date, the Debtor moved the Court to reschedule the 341 Meeting and the

confirmation hearing.[18] The Court did not address the Debtor's motion until it conducted the

scheduled confirmation hearing on July 9, 2013, at which time the Court ordered a new 341 Meeting

to be held and continued the confirmation hearing until October 22, 2013, which was subsequently

continued without date.

Since Local Rule 2083-1(h) provides that § 109(e) motions to dismiss will be heard at

confirmation unless ordered otherwise, it follows that the purpose of the 7-day filing deadline is to

give the debtor and the Court sufficient notice of a motion to dismiss before confirmation. Here,

however, the Court was not going to consider confirmation on July 9, 2013 because the Trustee had

not yet conducted a 341 Meeting in the Debtor's case. The Debtor and the Court therefore did not

need the 7-day notice prescribed by Local Rule 2083-1(h). It would elevate form over substance to

conclude that the Trustee's and PNC's Motions to Dismiss are untimely because they failed to meet

the July 2, 2013 deadline, when the purpose behind that deadline was obviated by the fact that the

Court was not going to consider confirmation a week later on July 9, 2013.

Moreover, at the confirmation hearing on July 9, 2013, the Trustee raised the § 109(e) debt

limits as a potential issue in this case. The Court then ordered a briefing schedule on the issue, which

---

[18] Docket No. 16, Debtor's Amended Ex Parte Motion to Reschedule Debtor's § 341
Meeting of Creditors.

provided that the parties would submit simultaneous briefs by October 1, 2013. By setting a new

deadline, the Court implicitly ruled that the original deadline prescribed by Local Rule 2083-1(h) no

longer applied. In sum, based on the Court's discretion, its interpretation of Local Rule 2083-1(h),

and the facts of this case, the Court finds that PNC's and the Trustee's Motions to Dismiss were

timely filed.

### B. Debtor's Objection to PNC's Standing as a Party in Interest

The Debtor next challenges PNC's standing to bring a motion to dismiss under § 109(e)

because the Debtor argues PNC is not the owner of the mortgage debt, but merely services it for an

"investor," which the Debtor believes is Wells Fargo.

The Court will more fully address PNC's standing later in this ruling. At the moment,

however, it suffices to note that the Trustee has also filed a motion to dismiss under § 109(e), and

it is not disputed that the Trustee has standing to do so.[19]

The Court will now address the merits of the motions and the Debtor's response.

### C. Section 109(e)

Section 109(e) confines eligibility for Chapter 13 relief to debtors whose debts do not exceed

certain statutory dollar-limit thresholds. Pursuant to § 104, those thresholds are subject to automatic

three-year adjustments by the Judicial Conference of the United States, not Congress.[20] The most

---

[19] *See, e.g., In re Stairs*, 307 B.R. 698 (Bankr. D. Colo. 2004) (Chapter 13 Trustee objected under § 109(e)); *In re Thompson*, No. 11–20138–13, 2011 WL 5520963, at *1 (Bankr. D. Kan. Nov. 14, 2011) (same).

[20] § 104(b) ("Not later than March 1, 1998, and at each 3-year interval ending on March 1 thereafter, the Judicial Conference of the United States shall publish in the Federal Register the dollar amounts that will become effective on such April 1 under sections . . . 109(e) . . . of [title 11.]").

recent adjustment took effect on April 1, 2013 and applies to cases filed on or after that date.[21] The

Debtor's case was filed on April 22, 2013. Therefore, the adjusted dollar amount under § 109(e)

applies in his case.

Taking the adjusted dollar amount into account, § 109(e) provides in pertinent part that

"[o]nly an individual with regular income that owes, on the date of the filing of the petition . . .

noncontingent, liquidated, secured debts of less than [$1,149,525] . . . may be a debtor under chapter

13 of this title."[22]

A debt is noncontingent "where all events that cause liability to arise occur pre-petition. It

is only where some future event must transpire before liability arises that a debt is contingent."[23] The

parties do not dispute that the mortgage debts are noncontingent, and in any event, the facts of the

case would show that they are in fact noncontingent. The Debtor does not deny that he entered into

notes and deeds of trust prior to filing his petition, which would make him liable on the loans. There

are no future events that must occur in order for the Debtor to be liable on these mortgage loans.

A debt is liquidated where it is "readily determinable," which in turn means that "the process

of determining the claim is fixed, certain, or otherwise determined by a specific standard."[24] In

*Adams*, the Tenth Circuit BAP elaborated that "[t]he key factor for determining whether a debt is

---

[21] Revision of Certain Dollar Amounts in the Bankruptcy Code Prescribed Under Section 104(a) of the Code, 78 Fed. Reg. 12089 (Feb. 21, 2013).

[22] § 109(e); Revision of Certain Dollar Amounts in the Bankruptcy Code Prescribed Under Section 104(a) of the Code, 78 Fed. Reg. 12089, 12090 (Feb. 21, 2013).

[23] *Kanke v. Adams (In re Adams)*, 373 B.R. 116, 119–20 (B.A.P. 10th Cir. 2007) (citing *In re Reader*), 274 B.R. 893, 896 (Bankr. D. Colo. 2002)).

[24] *Id*. (citing *Barcal v. Laughlin (In re Barcal)*, 213 B.R. 1008, 1014 (B.A.P. 8th Cir. 1997)).

liquidated or unliquidated is whether the debt is subject to a simple mathematical computation or ascertainable by reference to an agreement."[25]

Moreover, the majority view holds that "a dispute regarding liability on a claim is insufficient to render a claim unliquidated."[26] Were it otherwise, "a debtor, simply by characterizing certain claims as disputed, could ensure his eligibility to proceed under Chapter 13 in circumstances that Congress intended to exclude from that chapter."[27] The court expressed a similar concern in *In re Vaughan*, where it said, "[i]t is easy to envision debtors regularly using such a 'dispute' technique as a stalling device. If such a device were given judicial recognition it would create havoc."[28] Debtors would be able to "file a Chapter 13 petition and then 'dispute' the . . . debts, force the litigation to continue under Chapter 13, and then after months of costly delay the bankruptcy court would find that all had been in vain because the 'disputes' were only imagined and that the bankruptcy court lacked jurisdiction to adjudicate the claims."[29]

Courts have adopted two other approaches to the issue of whether a dispute over a debt renders it unliquidated. Judge Glen E. Clark of our court adopted the minority view in *In re Lambert*,[30] where he held that a dispute over the liability or amount of the debt makes it unliquidated.

---

[25] *Id*. at 120 (citing *Barcal*, 213 B.R. at 1014).

[26] *Id*. (collecting cases).

[27] *Id*. at 121 (citing *Mazzeo v. United States (In re Mazzeo)*, 131 F.3d 295, 305 (2d Cir. 1997)).

[28] *Vaughan v. Cent. Bank of the S. (In re Vaughan)*, 36 B.R. 935, 939 (N.D. Ala. 1984), *aff'd*, 741 F.2d 1383 (11th Cir. 1984).

[29] *Id*.

[30] *In re Lambert*, 43 B.R. 913 (Bankr. D. Utah 1984).

9

That decision, although well articulated, is not binding precedent. The third approach employs a middle ground between the *Adams* and *Lambert* views. This intermediate approach was adopted by the Ninth Circuit BAP in the case of *In re Nicholes*, where the BAP emphasized that a "dispute **may** render a debt unliquidated if it prevents the ready determination of a claim."[31] The central focus of this approach is not whether a dispute exists at all, but whether the debt, despite the dispute, "is subject to ready determination and precision in computation of the amount due."[32] The BAP continued: "it is the **nature** of the dispute, and not the existence of the dispute, that makes a claim unliquidated."[33] Therefore, under the *Nicholes* test, "debts of a contractual nature are generally liquidated" even if they are disputed.[34]

In *Adams*, the Tenth Circuit BAP prescribed guidelines for conducting a § 109(e) inquiry. When examining a debtor's eligibility to proceed under Chapter 13, the BAP stated, "it is appropriate for a court to 'rely primarily upon a debtor's schedules and proofs of claim, checking only to see if these documents were filed in good faith.'"[35] Although the Court declined to receive PNC's proofs of claim as evidence, the Court takes judicial notice of them.[36] As stated by Judge Somers in *In re*

---

[31] *Nicholes v. Johnny Appleseed of Wash. (In re Nicholes)*, 184 B.R. 82, 90 (B.A.P. 9th Cir. 1995).

[32] *Id.* at 91.

[33] *Id.* at 90.

[34] *Id.* at 91 (citations omitted).

[35] *Kanke v. Adams (In re Adams)*, 373 B.R. 116, 121 (B.A.P. 10th Cir. 2007) (quoting *Barcal v. Laughlin (In re Barcal)*, 213 B.R. 1008, 1015 (B.A.P. 8th Cir. 1997)).

[36] *St. Louis Baptist Temple, Inc. v. FDIC*, 605 F.2d 1169, 1172 (10th Cir. 1979) ("[A] court may . . . take judicial notice, whether requested or not, of its own records and files, and facts which are part of its public records.").

*Thompson*, "[t]he Sixth, Seventh, and Ninth Circuits have said the § 109(e) eligibility question is similar to the amount in controversy question in federal diversity jurisdiction cases, and should similarly be decided based on the debtor's assertions in the schedules unless the assertions were not made in good faith."[37] Just as determinations of federal diversity jurisdiction "cannot be allowed to dominate the proceedings themselves nor to delay them unduly[,]" determinations of eligibility under § 109(e) should be made with even greater celerity to conform with the object of Chapter 13, where time is of the essence and a debtor's resources are typically limited.[38]

In making the eligibility determination, however, "the court should neither place total reliance upon a debtor's characterization of a debt nor rely unquestionably on a creditor's proof of claim, for to do so would place eligibility in control of either the debtor or the creditor."[39] "Therefore, at a hearing on eligibility, the court should 'canvass and review the debtor's schedules and proofs of claim, as well as other evidence offered by a debtor or the creditor to decide only whether the good faith, facial amount of the debtor's liquidated and non-contingent debts exceed statutory limits.'"[40] Here, the Court does not find evidence of bad faith in the mere filing of the proofs of claim.

*Adams* therefore suggests that a court "should not conduct a full blown trial that authenticates

---

[37] *In re Thompson*, No. 11–20138–13, 2011 WL 5520963, at *1 (Bankr. D. Kan. Nov. 14, 2011) (citations omitted).

[38] *Comprehensive Accounting Corp. v. Pearson (In re Pearson)*, 773 F.2d 751, 756–57 (6th Cir. 1985).

[39] *Adams*, 373 B.R. at 121 (quoting *Barcal*, 213 B.R. at 1015).

[40] *Id*. (quoting *Barcal*, 213 B.R. at 1015).

11

each and every debt listed on a debtor's schedules and the proofs of claim filed."[41] Other courts take

a similar approach: "[T]he nature of the threshold eligibility issue is such that it should not be one

that is lengthy, involved, or so deeply evidentiary as to go to the point of having the Court

substantially dispose of the question of whether or not the [Debtor is] ultimately and legally liable

for each of the debts the existence or amount of which may have some bearing on the eligibility

issue."[42] This Court's ruling is not binding precedent or res judicata on the issue of whether the

claims should be allowed or disallowed, but the law is clear that the Court must make a facial

analysis of the claims for eligibility requirements, and should do so at the outset.

The Court emphasizes that on a motion to dismiss under § 109(e), it is making a

determination of the facial amounts of the debtor's debts and whether they exceed the thresholds

established by Congress. The scope of the Court's inquiry does not extend to broader issues, such

as a mortgage creditor's right to foreclose on the debtor's property. If the debtor does not meet the

§ 109(e) debt limits, those issues must be litigated in a court of competent jurisdiction.[43]

Looking at the Debtor's statements and schedules, his Schedule A lists a "half-ownership"

interest in his home in Mapleton, valuing the home at $1,617,200 with a secured claim of

$1,676,986.81.[44] Debtor's Schedule D lists two claims on the Mapleton property. The first-position

lien, held by "PNC Mortgage as Servicer for Unknown Creditor," is for $1,385,155.56, and the

---

[41] *In re Rottiers*, 450 B.R. 208, 216 (Bankr. D.N.M. 2011).

[42] *In re Odette*, 347 B.R. 60, 62–63 (Bankr. E.D. Mich. 2006).

[43] *See G & B Aircraft Mgmt. v. Smoot (In re Utah Aircraft Alliance)*, 342 B.R. 327, 332 (B.A.P. 10th Cir. 2006) (stating that a stay relief proceeding is limited in scope and is not the time to raise "other issues").

[44] Docket No. 13, Debtor's Schedule A.

second-position lien, also held by "PNC Mortgage as Servicer for Unknown Creditor," is for

$291,831.25.[45] Because those two claims exceed the Debtor's valuation of the Mapleton property,

the Debtor lists the second claim as unsecured in the amount of $59,786.[46] Debtor's Schedule D also

lists a $183,000 claim secured by a condominium owned by 714 Terrace Falls Condo, LLC,[47] which

the Debtor has also listed as held by "PNC Mortgage as Servicer for Unknown Creditor."[48] The

amount of the first-position lien on the Mapleton property alone exceeds the secured debt limit of

§ 109(e).

Noticing the proofs of claim on file yields a similar result. Taken together, the facial amounts

of claims 3-1, 5-2, 7-1, and 8-1, which assert secured claims against the Debtor's real property, total

$2,627,150.46. The amount of Claim 5-2, which asserts the first-position lien against the Debtor's

Mapleton property, alone exceeds the secured debt limit of § 109(e).

According to the Debtor's schedules and Exhibit 1, the facial amounts of the Debtor's debts

exceed the § 109(e) debt limits. This conclusion is buttressed by the proofs of claim, if the Court

considers them. But the Debtor has raised a number of arguments why he remains eligible to proceed

under Chapter 13. First, the Debtor argues that PNC is a loan servicer and therefore lacks standing

to file a proof of claim.[49] Standing is a threshold issue in all federal civil litigation, and the party

---

[45] Docket No. 13, Debtor's Schedule D.

[46] *Id*.

[47] *Id*.

[48] *Id*.

[49] Docket No. 99, Debtor's Consolidated Opposition to Motions to Dismiss by Chapter 13 Trustee and PNC Bank, National Association, ¶ 29.

asserting that it has standing bears the burden of proof to show it.[50] The promissory notes at issue

in this case are negotiable instruments under the Utah Uniform Commercial Code (the "Utah UCC").

With exceptions not relevant here, the Utah UCC provides that a negotiable instrument is:

> [A]n unconditional promise or order to pay a fixed amount of money, with or without interest or other charges described in the promise or order, if it:
>> (a) is payable to bearer or to order at the time it is issued or first comes into possession of a holder;
>> (b) is payable on demand or at a definite time; and
>> (c) does not state any other undertaking or instruction by the person promising or ordering payment to do any act in addition to the payment of money, but the promise or order may contain:
>>> (i) an undertaking or power to give, maintain, or protect collateral to secure payment;
>>> (ii) an authorization or power to the holder to confess judgment or realize on or dispose of collateral; or
>>> (iii) a waiver of the benefit of any law intended for the advantage or protection of an obligor.[51]

For PNC to qualify as a creditor entitled to file a proof of claim, it must show that it is a "person

entitled to enforce" the promissory notes.[52]

The Utah UCC provides that unless the parties agree which state's or nation's laws should

apply to a transaction between them, the Utah UCC "applies to transactions bearing an appropriate

relation to this state."[53] The note received as Exhibit 1 appears to have been executed in Utah, and

---

[50] *E.g., Summers v. Earth Island Inst.*, 555 U.S. 488, 493, 129 S. Ct. 1142 (2009). *See also Commonwealth Prop. Advocates, LLC v. Mortgage Elec. Registration Sys., Inc.*, 680 F.3d 1194, 1201 (10th Cir. 2011) ("One element of prudential standing is 'the general prohibition on a litigant's raising another person's legal rights.'").

[51] UTAH CODE ANN. § 70A-3-104(1) (2013).

[52] *Veal v. Am. Home Mortgage Servicing, Inc. (In re Veal)*, 450 B.R. 897, 920 (B.A.P. 9th Cir. 2011) (discussing UCC Article 3 and Article 9).

[53] UTAH CODE ANN. § 70A-1a-301(1) (2013).

14

the Debtor holds his primary residence in Utah. Therefore, the note bears an appropriate relation to this state, and Utah law applies.

Under the Utah UCC, an instrument may be enforced by "the holder of the instrument, a nonholder in possession of the instrument who has the rights of a holder, or a person not in possession of the instrument who is entitled to enforce the instrument pursuant to Section 70A-3-309 or Subsection 70A-3-418(4). A person may be a person entitled to enforce the instrument even though he is not the owner of the instrument or is in wrongful possession of the instrument."[54] In turn, a holder is "the person in possession of a negotiable instrument that is payable either to bearer or to an identified person that is the person in possession."[55] At the October 21 hearing, PNC's agents had possession of the original note, which is endorsed in blank, and the Debtor admitted that it was his signature on the note. "When indorsed in blank, an instrument becomes payable to bearer and may be negotiated by transfer of possession alone until specially indorsed."[56] Therefore, PNC is a "person entitled to enforce the note" and has standing to file a proof of claim. Moreover, even assuming that PNC is a servicer, "[m]any courts have held that a mortgage servicer has standing to participate in a debtor's bankruptcy case by virtue of its pecuniary interest in collecting payments under the terms of the note and mortgage."[57]

The Debtor then argues that PNC's proofs of claim are not entitled to prima facie validity

---

[54] UTAH CODE ANN. § 70A-3-301 (2013).

[55] UTAH CODE ANN. § 70A-1a-201(2)(u) (2013).

[56] UTAH CODE ANN. § 70A-3-205(2) (2013).

[57] *Litton Loan Servicing, L.L.P. v. Eads (In re Eads)*, 417 B.R. 728, 739 n.12 (Bankr. E.D. Tex. 2009) (collecting cases).

because they do not comply with Fed. R. Bankr. P. 3001(c).[58] In particular, the Debtor asserts that

the proofs of claim do not meet the requirements of Rule 3001(c) because PNC has not attached

payment histories with calculations of interest and late fees that prove that the Debtor in fact owes

the amounts PNC claims he owes.[59]

Rule 3001(f) provides that "[a] proof of claim executed and filed in accordance with these

rules shall constitute prima facie evidence of the validity and amount of the claim."[60] In turn, Rule

3001(c) requires a creditor to attach certain documentation to a proof of claim. Where a claim or

interest in property of the debtor securing the claim is based on a writing, Rule 3001(c)(1) requires

the creditor to file a copy of the writing with the proof of claim.[61] Here, PNC has attached the

appropriate deeds of trust executed by the Debtor to each of its proofs of claim.

In addition, in individual debtor cases a creditor must attach an itemized statement of interest,

fees, expenses, or charges, if such amounts have accumulated in addition to the principal amount

prior to the date of petition.[62] If the creditor claims a security interest in the debtor's property, the

creditor must provide a statement of the amount needed to cure a default as of the date of petition.[63]

Furthermore, if the security interest is claimed in the debtor's principal residence, Rule 3001(c)(2)(C)

"the attachment prescribed by the appropriate Official Form shall be filed with the proof of claim[,]"

---

[58] Docket No. 99, Debtor's Consolidated Opposition to Motions to Dismiss by Chapter 13 Trustee and PNC Bank, National Association, ¶ 45.

[59] *Id.* ¶ 47.

[60] FED. R. BANKR. P. 3001(f).

[61] FED. R. BANKR. P. 3001(c)(1).

[62] FED. R. BANKR. P. 3001(c)(2)(A).

[63] FED. R. BANKR. P. 3001(c)(2)(B).

and an escrow account statement prepared as of the date of petition must be filed if an escrow account was established in connection with the claim.[64] The official proof of claim form states that: "If the claim is secured by the debtor's principal residence, the Mortgage Proof of Claim Attachment is being filed with this claim"[65]

PNC filed the Mortgage Proof of Claim Attachment with each of its proofs of claim, which satisfies Rule 3001(c)(2)(A), (B), and (C). First, the Mortgage Proof of Claim Attachment provides an itemized statement of interest, fees, expenses and charges as required by Rule 3001(c)(2)(A). Second, it provides a statement of the cure amount as required by Rule 3001(c)(2)(B). Third, it is the attachment prescribed by Official Form B10 as required by Rule 3001(c)(2)(C). Therefore, the Court finds that PNC's proofs of claim satisfy the supporting information requirements of Rule 3001, and are entitled to prima facie validity under Rule 3001(f). As stated previously, it is not the intent of the Court here to determine that the claims are valid or invalid, but only to perform a facial analysis.

Even if PNC did not have standing to file a proof of claim, and even if PNC's proofs of claim were not entitled to prima facie validity, the Debtor's schedules and Exhibit 1 still show secured debts in excess of the § 109(e) debt limit. At this point, the Debtor raises the argument that the claims listed in his schedules are for informational purposes only and do not constitute an admission that a claim is valid, that a claim is secured, that he is liable on the claim, or that a debt even exists.[66]

---

[64] FED. R. BANKR. P. 3001(c)(2)(C).

[65] Official Form B10, at 2.

[66] Docket No. 99, Debtor's Consolidated Opposition to Motions to Dismiss by Chapter 13 Trustee and PNC Bank, National Association, ¶ 12.

In the same brief, however, the Debtor also admits to listing the claims for the purpose of identifying

what claims he wants covered by and discharged in his bankruptcy.[67] The Debtor cannot have it both

ways. At its core, the Debtor's assertion that the claims in his schedules are listed for informational

purposes only is an argument that he is not liable on the claims, or that the claims are not liquidated.

As stated in *Adams*, however, "a dispute regarding liability on a claim is insufficient to render a

claim unliquidated."[68]

In a similar vein, the Debtor argues that § 109(e) speaks in terms of "debts," not "claims,"

and that claims listed in his schedules or on proofs of claim are not transmuted to debts for purposes

of a § 109(e) analysis.[69] It is true that "claim" and "debt" are separately defined under § 101. A claim

is a "right to payment,"[70] while a debt is "liability on a claim."[71] In *Lambert*, the court considered

whether a debtor met the § 109(e) debt limits. The court carefully distinguished between "debt" and

"claim" and concluded that Congress made a conscious choice to use "debt" rather than "claim" in

§ 109(e) because it did not want a debtor's eligibility "to be predicated upon the mere demands of

creditors."[72]

But the two words are not as far apart as the Debtor argues. In certain contexts, the words are

synonymous. In fact, the *Lambert* court recognized that "the two terms [can refer] to a single

---

[67] *Id*. ¶ 23.

[68] *Kanke v. Adams (In re Adams)*, 373 B.R. 116, 120 (B.A.P. 10th Cir. 2007).

[69] Docket No. 99, Debtor's Consolidated Opposition to Motions to Dismiss by Chapter 13 Trustee and PNC Bank, National Association, ¶ 24.

[70] § 101(5).

[71] § 101(12).

[72] *In re Lambert*, 43 B.R. 913, 919 (Bankr. D. Utah 1984).

18

obligation as seen from the point of view of the debtor and the creditor, respectively—a debtor has 'debts,' and a creditor has 'claims.'"[73] Moreover, although the Debtor disputes his liability on the claims asserted by PNC, that dispute goes more to his liability to PNC rather than his underlying liability on the notes and deeds of trust. The Debtor has not disputed that he signed the notes and deeds of trust that accompany PNC's proofs of claim, and in fact admitted that he signed the promissory note that was admitted into evidence as Exhibit 1. Even if he is not liable to PNC, the Court can discern that the Debtor has incurred secured debts—that is, he is liable on the mortgage loans.

The Debtor next argues that PNC's claims are unliquidated because he has a number of defenses, offsets, and claims he intends to assert against PNC, including breach of the duty of good faith and fair dealing, wrongful foreclosure, breach of contract, negligent or intentional infliction of emotional distress, violation of the Fair Debt Collection Practices Act, and equitable reformation of his mortgage loan.[74] The Debtor argues that these claims represent offsets that must be deducted from PNC's claim for purposes of § 109(e).[75]

The Debtor does not place a dollar value on these claims and offsets, except that he believes that with punitive damages, his recovery against PNC could exceed the amounts PNC has asserted in its proofs of claim.[76] The Debtor's claims against PNC, if valid, have yet to be determined, and

---

[73] *In re Burgat*, 68 B.R. 408, 409 (Bankr. D. Colo. 1986) (discussing *Lambert*).

[74]    Docket No. 99, Debtor's Consolidated Opposition to Motions to Dismiss by Chapter 13 Trustee and PNC Bank, National Association, ¶ 48–57.

[75] *Id*. ¶ 57.

[76] *Id*. ¶ 56.

accordingly, they truly are unliquidated. This Court is unable to determine how much of the Debtor's claims against PNC, if any, should provide an offset to PNC's claims. But even if the Debtor's claims against PNC were readily determinable in amount, that would not render PNC's claims unliquidated for a section 109(e) analysis. The fact that a claim is "subject to defenses and counterclaims," is not relevant to determining whether it is liquidated or unliquidated.[77] As the court noted in *Lambert*,

> [A] dispute based upon a debtor's claim of an offset against a creditor is not in itself a dispute over debt liability or amount. It is a dispute over the existence, validity, or amount of a second and independent debt raised and asserted as an offset in an attempt to reduce the amount of the first debt. The assertion of a second debt as an offset will not render the first debt unliquidated because the offset claim creates no uncertainties with regard to the liability underlying or the amount due upon the first debt.[78]

Therefore, the Debtor's claim of an offset against PNC does not render the debt owed to PNC unliquidated.

The Debtor then argues that the dollar-limit thresholds of § 109(e) are arbitrary, and that determining whether the Debtor qualifies for Chapter 13 relief based on a dollar figure, rather than a substantive test, is contrary to the legislative purpose of § 109(e) and violates his substantive due process rights.[79] The Debtor is correct when he notes that one legislative impetus behind the Bankruptcy Reform Act of 1978 was to extend the availability of Chapter 13 to self-employed small

---

[77] *Sylvester v. Dow Jones & Co. (In re Sylvester)*, 19 B.R. 671, 673 (B.A.P. 9th Cir. 1982).

[78] *Lambert*, 43 B.R. at 921.

[79] Docket No. 99, Debtor's Consolidated Opposition to Motions to Dismiss by Chapter 13 Trustee and PNC Bank, National Association, ¶ 9–10.

business owners as an alternative to the more-expensive Chapter 11.[80] At the same time, however, Congress determined that Chapter 13 should not be available to all potential debtors, and to that end, Congress established an inflexible debt-limit cap under § 109(e). This cap may appear arbitrary because it is embodied in a precise dollar figure, but the cap is part and parcel of Congress's reasoned policy decision about who should be proceeding in Chapter 13. In that sense, it is the very opposite of arbitrary.

The Debtor's suggestion that a court should employ a substantive test rather than the debt-limit cap to determine who is eligible for Chapter 13 relief is contrary to the plain and unambiguous language of § 109(e). Congress has prescribed the test, and it is the Court's task to administer it. Where the language of a statute is clear, "the sole function of the courts is to enforce it according to its terms."[81]

Regarding the Debtor's due process claim: the law distinguishes between procedural and substantive due process. "Procedural due process ensures the state will not deprive a party of property without engaging fair procedures to reach a decision, while substantive due process ensures the state will not deprive a party of property for an arbitrary reason regardless of the procedures used to reach that decision."[82] While *Hyde Park* involved a due process challenge under the Fourteenth

---

[80] *Comprehensive Accounting Corp. v. Pearson (In re Pearson)*, 773 F.2d 751, 753 (6th Cir. 1985).

[81] *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241, 109 S. Ct. 1026 (1989) (quoting *Caminetti v. United States*, 242 U.S. 470, 485, 37 S. Ct. 192 (1917)).

[82] *Hyde Park Co. v. Santa Fe City Council*, 226 F.3d 1207, 1210 (10th Cir. 2000) (citations omitted).

Amendment, other courts have cited it where Fifth Amendment due process concerns were at issue.[83]

Moreover, the standard announced by *Hyde Park*, which examines the arbitrariness of government

action, is consistent with that articulated by courts confronted with Fifth Amendment substantive due

process claims. As stated by the Eleventh Circuit Court of Appeals, where social or economic

legislation is at issue, such as that under the Bankruptcy Code, that legislation "generally will be

upheld against a substantive due process attack unless the legislation 'manifests a patently arbitrary

classification, utterly lacking in rational justification.'"[84]

   To prevail on a due process claim, "a plaintiff must first establish that a defendant's actions

deprived plaintiff of a protectible property interest."[85] In the context of the Due Process Clause,

property means a "'legitimate claim of entitlement' to some benefit."[86]

   The Debtor appears to argue that he has a legitimate claim of entitlement to proceed under

Chapter 13 of the Bankruptcy Code, and Congress's use of a dollar-limit cap in § 109(e), which

---

[83] *E.g., Davis v. Hosterman (In re Hosterman)*, Adv. No. 07-01082-M, 2007 WL 2973592, at *4–5 (Bankr. N.D. Okla Oct. 9, 2007) (excepting a debt from discharge under section 523(a)(15) did not violate the debtor's substantive due process rights); *Onyeabor v. Centennial Pointe Owners Ass'n (In re Onyeabor)*, BAP No. UT-11-117, 2013 WL 819726, at *6 (B.A.P. 10th Cir. Mar. 6, 2013) (denying the debtor's arguments that the bankruptcy court denied her due process when it prevented her from conferring with her attorney, converted her case without determining whether a judgment was secured or unsecured, and mooted her objection to a party's standing) (unpublished table decision).

[84] *Wood v. United States (In re Wood)*, 866 F.2d 1367, 1370–71 (11th Cir. 1989) (quoting *Flemming v. Nestor*, 363 U.S. 603, 611, 80 S. Ct. 1367 (1960)). *See also Onyeabor*, 2013 WL 819726, at *7 ("Because the Bankruptcy Court did not *arbitrarily* convert Debtor's case to a Chapter 7, there was no substantive due process violation.") (emphasis added).

[85] *Hyde Park*, 226 F.3d at 1210 (citing *Weathers v. West Yuma County Sch. Dist. R-J-1*, 530 F.2d 1335, 1340–42 (10th Cir. 1976)).

[86] *Id*. (quoting *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S. Ct. 2701 (1972)).

could prevent him from proceeding under that chapter, arbitrarily deprives him of the ability to prosecute a Chapter 13 case and therefore violates his substantive due process rights.

In the first place, it is not clear that the Debtor, let alone any potential debtor, has a legitimate claim of entitlement to proceed under Chapter 13. The Supreme Court has held that "a debtor has no constitutional or 'fundamental' right to a discharge in bankruptcy."[87] But even assuming that the Debtor did have a legitimate claim of entitlement to pursue relief under Chapter 13, this Court concludes that Congress's choice to use a dollar-limit cap in § 109(e) to regulate who is and who is not eligible for Chapter 13 relief is not arbitrary for the reasons mentioned previously. Therefore, the Debtor's due process argument fails and is not persuasive with the Court.

In sum, the Court finds the Debtor's secured mortgage debts noncontingent, liquidated, and in excess of $1,149,525. The Debtor has disputed his liability on PNC's claims, but the Court finds that those claims are readily determinable for the purpose of the current motions.[88] The notes and deeds of trust attached to PNC's proofs of claim evidence the Debtor's liability on those mortgage loans, and as stated by the Tenth Circuit BAP in *Adams*, one way that a debt may be found liquidated is if it can be ascertained by reference to an agreement. The Court also finds that the Debtor's debts are liquidated under the intermediate standard announced by the Ninth Circuit BAP in the *Nicholes* case because the dispute over the claims has not prevented them from being readily determinable.

---

[87] *Grogan v. Garner*, 498 U.S. 279, 286, 111 S. Ct. 654 (1991). *See also United States v. Kras*, 409 U.S. 434, 445, 93 S. Ct. 631 (1973) ("We see no fundamental interest that is gained or lost depending on the availability of a discharge in bankruptcy.").

[88] By this ruling, the Court is not finding that the Debtor does not have valid claims against PNC, but is only determining eligibility, which is not a full-blown trial on the merits. The Debtor may assert those elsewhere.

23

## IV. CONCLUSION

Having concluded that analysis, the sole task remaining for the Court is to determine the appropriate outcome for the Debtor's case. PNC requests that the Debtor's case be dismissed, while the Trustee has asked this Court to dismiss the case and annul the petition. When faced with a debtor who is ineligible under § 109(e), courts have, "with apparent unanimity, concluded that . . . the case should be either voluntarily converted or dismissed."[89] This conclusion is based on a number of policy considerations. For example, if a court chose to declare a petition void *ab initio* because the debtor exceeded the debt limits of § 109(e), a debtor arguably would have no remedy against a creditor who took action in violation of the automatic stay while the debtor's case was pending. In addition, where a court strikes a debtor's petition rather than dismisses his case, the debtor arguably could file repeatedly without becoming subject to the 30-day limitation of § 362(c)(3) in a subsequent case filed within the following year.

Therefore, the Court will dismiss Mr. Cannon's case, but will not annul the petition.

_____END OF DOCUMENT_____

---

[89] *In re Seaman*, 340 B.R. 698, 701 (Bankr. E.D.N.Y. 2006) (collecting cases).

_____ooo0ooo_____
## SERVICE LIST

Service of the foregoing **MEMORANDUM DECISION** will be effected through the Bankruptcy Noticing Center to each party listed below.


Douglas R. Short
BANKRUPTCY CENTER OF UTAH
177 East Ft. Union Blvd.
Midvale, UT 84047
　　　　*Attorney for Debtor*

Christopher Black Cannon
875 East 1600 North
Mapleton, UT 84664
　　　　*Debtor*

Anthony C. Kaye
Matthew L. Moncur
Steven D. Burt
BALLARD SPAHR LLP
201 South Main Street, Suite 800
Salt Lake City, UT 84111-2221
　　　　*Attorneys for PNC Bank, N.A.*

Kevin R. Anderson
Ken Garff Bldg.
405 South Main Street, Suite 600
Salt Lake City, UT 84111
　　　　*Chapter 13 Trustee*